### McNEELY et al. v. WILLIAMES et al.

### WILLIAMES et al. v. McNEELY et al.

(Circuit Court of Appeals, Third Circuit.   October 4, 1899.)

1. PATENTS—INVENTION—STEAM-HEATING APPARATUS.
    Claims 1 and 3 of the Williames patent, No. 256,089, for an improvement in heating apparatus, cover patentable combinations not disclosed in the prior art, and are valid.

2. SAME—ANTICIPATION.
    To sustain the defence of anticipation, it is necessary that the anticipatory matter should clearly show the invention subsequently patented, in such manner as to enable any person skilled in the art or science to which it relates to construct, and practically use, the invention, for the purposes contemplated by the subsequent patent.

3. SAME—SUIT FOR INFRINGEMENT—EFFECT OF PRIOR DECISIONS.
    A circuit court of appeals is not required, by considerations of comity, to follow the decision of a circuit court of another circuit, upon questions relating to the validity of a patent.

4. SAME—ANTICIPATION—HEATING APPARATUS.
    Claims 2, 5, and 7 of the Williames patent, No. 256,089, for an improvement in heating apparatus, which are broad claims, covering the use of means to create a suction in steam-heater pipes to cause or facilitate the passage of steam through such pipes, were not anticipated by the Reid and Billinton English patent, No. 2,603, granted in 1877, it being shown that the invention of Williames was prior in date, nor by anything in the prior art, and such claims are valid.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

Joseph C. Fraley, for McNeely & Co.
E. H. Hunter, for Williames and others.

Before ACHESON, Circuit Judge, and BUFFINGTON and BRADFORD, District Judges.

BRADFORD, District Judge. These are cross appeals from the final decree of the circuit court for the Eastern district of Pennsylvania (64 Fed. 766), in a suit for alleged infringement of letters patent No. 256,089, dated April 4, 1882, granted to Napoleon W. Williames for an improvement in heating apparatus. The defences set up are lack of novelty and of invention, non-infringement and failure to disclaim. The specification of the patent in suit in describing the invention alleges in part as follows:

"It consists in tapping an ordinary unobstructed exhaust-pipe from a steam engine and connecting it through said taps with ordinary heating-coils; further, in connecting the outlet or bleeder pipes from said heating-coils with a main which communicates with a tank or hot-well in which a partial vacuum is maintained; further, in combining said hot-well and bleeder-main with a vacuum-pump; further, in means by which the heating-coils may be cut out of operation and the exhaust-steam, or part of it, may be drawn through the hot-well to heat the feed-water for the boiler; further, in a hot-well, in combination with heating-coils for steam and bleeder-pipes, with their main to return the part of the exhaust-steam and condense the same and return it to the boiler as feed-water. * * * The object of my invention is to construct suitable mechanism by which the usual back pressure to the steam-engine, due to loading the exhaust for the purpose of creating a forced circulation in the heating-coils, is dispensed with, this mechanism being substantially means to create a suction through the heating-coils to draw steam from a free or open exhaust-pipe, and thereby perform the double function of heating the building without back pressure to the engine and reducing the normal pressure by creating a partial vacuum in the exhaust-pipe."

The claims are as follows:

"1. In apparatus for heating buildings, the unobstructed exhaust-pipe and heating-coils opening from it, in combination with a bleeder-pipe connecting with said coils and opening at the bottom into a hot-well in which a partial vacuum is maintained, substantially as and for the purpose specified.

"2. In apparatus for heating buildings, the unobstructed exhaust-pipe and heating coils opening into it in combination with a bleeder-pipe connecting with said coils and means to create a suction in said bleeder-pipe, substantially as and for the purpose specified.

"3. In apparatus for heating buildings, the unobstructed exhaust-pipe A, heating-coils B, bleeder-main D, hot-well E, suction or exhaust fan F, and feed-water pipe N, substantially as and for the purpose specified.

"4. In apparatus for heating buildings, the combination of an exhaust-pipe with heating-coils B, or their equivalent, bleeder pipe or main D, provided with valve L, hot-well E, pipe J, with its valve K, exhaust-fan F and its pipe G, and feed-water pipe N, substantially as and for the purpose specified.

"5. In apparatus for heating buildings, an exhaust-pipe and steam-heating apparatus, in combination with means to suck steam from said exhaust into or through said heating apparatus, substantially as and for the purpose specified.

"6. The combination of exhaust-pipe A, heaters B, bleeder-main D, hot-well E, vacuum-valve L, and vacuum-pump F, substantially as and for the purpose specified.

"7. In apparatus for heating buildings, a steam-main into which steam is fed, in combination with steam-heating apparatus and means to create a suction through said heating apparatus, to draw steam from the main into said heating-apparatus."

The bill charges the defendants with infringement "by having caused to be constructed for their use, and by using heating apparatus substantially the same in construction and operation as in the said letters patent is described and claimed, and particularly in the first and third claims thereof." In May, 1887, Williames

and his then licensee, Robert Coddington, brought suit in the circuit court for the Southern district of New York against George A. Barnard and the Ingersoll Rock Drill Company for the infringement of claims 1, 2, 3, 5 and 7 of this patent. That court filed an opinion February 12, 1890 (41 Fed. 358), sustaining its validity as to claims 1 and 3 and holding that those two claims had been infringed, and made an interlocutory decree for an injunction and an accounting June 11, 1892. In that case it was held that the broad claims 2, 5 and 7 were invalid on the ground that as to them the patent had been anticipated by an English patent No. 2,603, granted to Reid & Billinton, for "Improvements for Warming Railway Carriages and in Brake Apparatus Connected Therewith," dated July 5, 1877, and sealed December 7, 1877. It does not appear that any disclaimer has been entered as to the broad claims or any of them; nor does it appear that any evidence was adduced in the New York case on the accounting so decreed or that a final decree has been made. The bill in the present case was filed January 27, 1893. The answer as amended alleges that the patent in suit is wholly void by reason of unreasonable neglect or delay on the part of Williames to enter a disclaimer of the subject matter of invention as set forth in claims 2, 5 and 7. The court below failed to find such unreasonable neglect or delay and sustained claims 1 and 3, but held that the ruling of Judge Coxe in the New York case that the broad claims had been anticipated by the Reid & Billinton apparatus should be followed, and that, no disclaimer as to them having been entered, no costs could be recovered by the complainants. It appears from the evidence taken before the master and from his report that at the time of the alleged infringement in September, 1888, the complainants had established with the public a license of $5 per square foot of grate bar surface or its equivalent for the use of the Williames apparatus; that the license fee for the defendants on that basis would have amounted to $687.50; and that aside from the loss of this sum with interest no damage had been sustained by the complainants, nor any gains or profits made by the defendants, through the alleged infringement. The master seems to have taken the view that the licenses relied on to establish the amount of the fee covered the use of such heating-apparatus as was inclusive of all the claims of the patent in suit, and, claims 2, 5 and 7 having been adjudged invalid, and claims 1 and 3 sustained, and there being no evidence by which an apportionment of the fee could be made, reported that the complainants were entitled only to nominal damages. The court below took the same view and accordingly decreed that the complainants recover six cents, without costs. The complainants contend that the court erred in not awarding them damages equal to the sum of $687.50, together with interest from September, 1888, and also costs. The defendants claim that the bill should have been dismissed. The questions before us are substantially whether, aside from the omission to disclaim, claims 1 and 3 were valid and were infringed by the defendants; whether a disclaimer should have been entered and, if so, whether the omission to enter it was the result of un-

reasonable neglect or delay on the part of Williames; and whether the complainants, if entitled to recover, should not have been awarded by way of damages the amount of the established license fee, with interest from the date of infringement. Careful examination of the evidence has led us to the conclusion reached by Judge Coxe in the New York case and by the court below that claims 1 and 3 cover combinations not disclosed in the prior art, and that those combinations were patentable. We are also satisfied that both of these claims were infringed by the apparatus used by the defendants and complained of in the bill. That apparatus includes the same combinations of parts or equivalent parts co-operating in substantially the same manner to perform the same function as the combinations respectively covered by these two claims. It therefore becomes necessary to consider the alleged defence based on the failure of Williames to enter a disclaimer as to claims 2, 5 and 7. On the assumption that it was incumbent on him to disclaim, if his omission to do so was the result of unreasonable neglect or delay, the complainants were not entitled to recover anything, while, if there was no such neglect or delay, they were entitled to recover damages, but no costs. No disclaimer was necessary to the recovery either of damages or of costs unless Williames in those three claims or one or more of them included something to which he was not entitled. Certain patents and other publications prior to the date of the patent in suit are set up by way of anticipation, and it is contended that they sufficiently disclose the subject matter of the broad claims. To sustain the defence of anticipation it is necessary that the anticipatory matter should clearly show the invention subsequently patented in such manner as to enable any person skilled in the art or science to which it relates to make or construct and practically use the invention for the purposes contemplated by the subsequent patent. Eames v. Andrews, 122 U. S. 40, 66, 7 Sup. Ct. 1073. Applying this rule it is clear that none of the prior patents or publications relied on, with the exception of the Reid & Billinton patent, discloses the invention covered by claims 2, 5 or 7. The Corey patent of November 25, 1873, for an "Improvement in Water-Tanks for Hotels" covers apparatus for the utilization of escape steam in heating water and does not relate to the circulation of steam for heating purposes nor suggest Williames' invention. Nor does the condensing engine disclose that invention. The distinctive feature of such an engine consists in devices to create a vacuum in the cylinder by an immediate condensation of steam in front of the piston. It is the distinctive purpose and operation of the invention in question to prevent condensation of steam in the heating pipes. While a vacuum, total or partial, is created in each case, the purpose for which it is created in the two cases respectively are wholly different. The condensing engine does not suggest steam-heating apparatus. Claim 5 of the patent in suit covers a combination of an exhaust pipe and of means to suck steam from it into or through the apparatus. The exhaust pipe may or may not be obstructed or weighted in such manner as to cause back pressure to the engine. This claim does

not in terms require an unobstructed exhaust, and it cannot be so construed in the light of the description. The patentee says:

"My invention may be applied to the loaded exhaust heaters now in common use by simply attaching an exhaust or vacuum pump to the bleeder-main and creating a suction therein; but I prefer in all cases to use an open exhaust-pipe. It is immaterial to my invention whether the exhaust is unobstructed or weighted, or whether an engine is used or not, as my invention comprehends broadly a main to supply steam when arranged with steam heaters, and means to create a suction through said heaters."

Nor does claim 5 exclude the idea of the existence of sufficient pressure in the exhaust to cause steam to pass therefrom into bleeder mains or heating pipes. Nothing is said on this point. The passage of steam into the mains and pipes would naturally result from the weighting or obstruction of the exhaust pipe. The "means to suck steam from said exhaust into or through said heating apparatus" may therefore consist of devices which by suction aid or facilitate, as well as those which wholly cause, the passage of steam from the exhaust pipe into and through the bleeder mains and heating pipes. Substantially the same considerations apply to the combination covered by claim 7. The exhaust pipe in the combination covered by claim 2 is unobstructed, and it is unnecessary particularly to consider this claim in this connection. The Reid & Billinton patent discloses a combination in apparatus for heating railway cars, including an exhaust pipe from which steam freely passes into heating pipes and means for causing through suction the circulation of the steam through those pipes. Judge Coxe in the New York case held that claims 2, 5 and 7 were clearly anticipated by this English patent. The learned judge below followed the ruling of Judge Coxe, saying: "I think that the ruling of Judge Coxe that the Reid and Billinton apparatus anticipated the broad claims of the Williames patent should be followed." He also said: "It has not been conclusively settled that Williames claimed anything of which he was not the original and first inventor," etc. This court as an appellate tribunal is not in the least concluded by the decision in the New York case, nor do considerations of comity toward a circuit court with respect to its rulings have the same potency with a circuit court of appeals as they may properly have with a circuit court when confronted with the alternative of following or departing from the ruling of another circuit court. Assuming that the Reid & Billinton patent discloses the subject-matter of the broad claims of the patent in suit—a point which we do not now decide—did the English patent antedate the invention of Williames? On this question there is considerable evidence. Williames testifies to the effect that he conceived the invention described and claimed in his patent in 1871 and in 1872 disclosed it to the Keystone Council of Engineers in Philadelphia; that a minute was made of what transpired at that time; that the experiments he made before that body convinced him that his invention was practical; that the other members of that body, while admitting that it might work on a small scale, did not believe it could circulate steam throughout a mill without back pressure on the engine; that thereafter he tried to get it introduced in some mill on

a large scale; that in this effort he was unsuccessful for several years because he had not sufficient means to introduce his system on a large scale and others who wanted steam heating had no confidence in his system; that after much difficulty in overcoming the incredulity of those to whom he mentioned the subject he finally succeeded in having his system introduced in the Chatham mills in 1880; that prior to that time he explained his invention to sundry persons on different occasions who have testified in this case; and that while he always contemplated the securing of a patent from the time of his conception he delayed applying for one until he had put the system into operation on a large scale and thoroughly tested it. The minute of the Keystone Council of Engineers in January, 1872, above referred to, is as follows:

"The balance of the evening taken in experimenting, the subject was boiling-point of water. The apparatus being got ready, namely, a bottle of ordinary river-water, and heated with an alcohol lamp, when no hotter than could be held in the hand, was made to boil by relieving it of the pressure of the atmosphere, by a vacuum-pump. Water was then brought to the boiling-point, with heat, when the hose attached and at the end a hollow ball, after the air had been expelled, the lamp removed, the water in the jar was kept boiling by condensation, namely by a flow of cold water on the ball. The open mercury column gauge next produced, when the members commenced blowing, to test the strength of their lungs, also the gauge from 1 to 2½ lbs. per square in. was reached, the gauge attached to the steam-bottle, but, the hour of adjourning having arrived, the experiment ceased, to be continued next Tuesday evening."

This minute possesses much significance. It shows that in 1872 Williames caused water at a temperature far below the normal boiling point to boil by relieving it of atmospheric pressure through the action of a vacuum pump. It also shows that he at that time caused water which had reached the boiling point from heat applied by a lamp to continue to boil after the removal of the flame through the condensation of steam in a hollow ball by the use of cold water, the steam passing from the vessel to which the lamp had been applied through hose into the ball. The principle of operation of the apparatus used in 1872 appears to be the same as that on which the broad claims of the patent are founded. Here was a bottle of boiling water connected with a hollow ball by hose, and steam sucked or drawn through the hose from the bottle into the ball by means of condensation occurring therein. The disclosure made by Williames in 1872 imparts to his testimony and that of other witnesses relating to a later date great force which it might not otherwise possess. Williames states: "I applied a vacuum pump for circulating steam through a coil in 1872. I applied the same principle to circulating the steam in heating factories in 1880." With respect to the manner in which the coil was connected he says: "In 1872 it was connected with a flask with water in, and in 1880 it was connected with the exhaust pipe of an engine." The witness Peifer testifies that the Williames system of steam heating was first brought to his attention in 1872 at the rooms of the Keystone Council of Engineers; that Williames explained it to those present; that "all the members ridiculed it"; that what was done there at that time was "only illustrating

how water could be made to boil under a vacuum, and by using that experiment also showing how steam could be carried through pipe by using a globe that we had for experimenting"; and that afterwards in 1872 he saw other experiments made by Williames, "something similar, on the same basis, with the exception of drawing it through a coil of pipe; that is, using steam through, showing that we could heat the pipe and also boil water and do heating with it." Early in 1877 Williames entered the employ of John Rommel as engineer for a certain building on Carter Street, Philadelphia. The building was large, having eight stories, and was used for various manufacturing purposes. The time is fixed by a written agreement between Williames and Rommel, a copy of which is an exhibit, dated January 23, 1877. Among the stipulations on the part of Williames were the following:

"2d. That during the term of his service he will use his best judgment, skill and efforts to run the engine and machinery economically.

"3d. That at his own expense for labor (but not for material) he will make such alterations and improvements in the engine and machinery as his experience and knowledge may suggest so that by increased economy in fuel as much gain as he can possibly make shall be gained for the advantage of said Rommel."

Within two weeks after the execution of the above agreement Williames, in accordance with his undertaking to run the engine and machinery economically, endeavored to secure the introduction of his system in the Carter Street building. He says:

"I explained it to Mr. Sprogell, who was the manager. * * * I stated to Mr. Sprogell that I wanted to change the live steam heating to exhaust, which would make a great deal of saving in coal; but he couldn't believe there was any such thing as circulating steam below the atmosphere, that they had had an experience of trying to use exhaust steam. * * * I explained to him that by putting on a pump, making changes from the live steam connection to exhaust, I would be able to circulate the exhaust steam without any back pressure on the engine. That the greater cost was nothing in the way of coal for heating the building."

The witness Sprogell says:

"Mr. Williames was employed at Carter Street for the very purpose of introducing methods for the saving of expense. * * * The first thing that he did was to go over the building and see what was wrong. He found the shafting out of line all over the building, and indeed the engine was out of jig, out of repair, out of order, and the heating of the building, which was done then by exhaust steam, according to his figuring at that time, which I suppose was correct, was one of the greatest items of expense—that is, the consumption of coal. My recollection is that we were carrying a back pressure on the engine of—I think they measure it by inches, though I am not sufficient of a mechanic to tell that, but I think it was 15 inches—that is my recollection—fifteen pounds perhaps it was—back pressure. For the purpose of relieving that waste, Mr. Williames at that time suggested this method of re-arranging the steam heating apparatus—the coils—and he said that he could heat the whole building. We had never been able to heat the upper stories, and he said that he could heat the whole building by putting a vacuum pump at the end of the steam heating pipes. I did not believe it and it was not adopted. * * * Well, I did not believe in it. It would have been expensive to have re-arranged the steam pipes—very expensive. It was a large building, fifty feet front, eight stories high, and I did not think that the system was feasible. * * * His idea was this generally, because I do not pretend to recall exactly at this late stage—that he could draw steam through the pipes by making a vacuum at the other end of the pipe—at the

tail end—the waste end. I told him that it couldn't be done. He argued the matter more than once—I suppose a dozen times. * * * He said he knew it could; he insisted on it. I told him I did not believe it could. * * * The principle described in 1877 was exactly the principle he put in in 1881. * * * I mean the principle of moving the steam through the pipes by the use of a vacuum."

The witness Rich, in reference to certain conversations with Williames within a few weeks after the latter had been employed by Rommel, says:

"He told me he had a plan by which he could circulate exhaust steam through any amount of heating pipe without any back pressure on the engine. In fact, he said he could do it by even diminishing the pressure in the pipes. He told me he would create a vacuum in the pipe; relieve the atmospheric pressure, and that would cause the steam to circulate through without any back pressure on the engine. * * * He explained his system; he said it consisted of a pump attached to the system by which he would draw the air out of the pipes and create a partial vacuum in the pipes. He claimed then the steam would go through without any back pressure whatever on the engine. * * * It seemed to me to be ridiculous at that time, and I spoke to my brother about it and he said he didn't think it could be done."

The witness Peifer, speaking of the Williames system, says:

"I myself tried to get it introduced in the mill about, I think 1876. It may have been before that. Say 1876, anyhow. The mill then was owned by Mr. Thurlow. We had trouble in heating at that time, and he ridiculed the idea of it, and laughed at it, and finally, in 1878, the mill was burned down. * * * In 1878 Montague & White got the mill. I wanted to put it in at that time, and they would not listen to it. They ridiculed it. * * * In 1880 the mill burned down the second time, and I proposed to put it in then again and had hard trouble to get it there. Both Mr. Williames and I did all we knew how to get it in, and the only way I could get it in was by using the old pipe that had been in the fire and doing the work myself with Mr. Williames' assistance, and then hiring laboring hands at five dollars a week, which made it cheaper then than if we had got an outside man to have done it, because they would not use the old pipe."

It appears from the evidence that the first time the above mentioned mill burned down was January 10, 1878, and the second time February 9, 1880. Peifer also states that the Williames system as introduced in the Chatham mills in 1880 was substantially the same system as was disclosed to him by Williames in 1872. These witnesses have not been contradicted or discredited in any manner. Their story is consistent and natural and possesses strong inherent probability. It is supported and strengthened by the minute of the proceedings before the Keystone Council of Engineers, the written agreement between Williames and Rommel, and the production of diaries to fix dates. The record does not disclose anything to indicate that Williames knew or heard of the Reid & Billinton invention or patent before introducing his system in the Chatham mills in 1880. The question before us in this connection relates, not to priority of use, but to priority of invention. We are satisfied that Williames in 1872, or prior thereto, conceived the broad idea disclosed in his present system, and that in that year he embodied his conception in apparatus which, though crude in its construction and not adapted to practical use, disclosed the subject matter of the broad claims of the patent in suit.

That others received his invention with incredulity and ridicule was no fault of his. He never abandoned his invention. Nor do we find such laches on his part as to deprive him of its fruits. He was a poor man and was ill for a long time. He unaided was without means to construct his apparatus on such a scale as would demonstrate its merit. Those to whom he applied for its introduction turned a deaf ear to him. In the face of discouragement and with reasonable diligence in view of his circumstances he persisted in his efforts until they were finally crowned with success. We must, therefore, hold that the Reid & Billinton apparatus did not anticipate any of the claims of the patent. in suit, and consequently that Williames was under no obligation to enter a disclaimer. The conclusion reached practically disposes of the contention on the part of the defendants that the complainants were not entitled in any event to recover more than nominal damages. It appears from the evidence that at the time of infringement there was an established license fee for the use of apparatus such as that employed by the defendants, and that it amounted on the proper basis of computation to $687.50. This sum, with interest from September, 1888, is the measure of damages which the complainants are entitled to recover. They are also entitled to costs in this court and in the court below. The decree below is reversed, with directions to the circuit court to enter a decree for complainants in accordance with this opinion.