## ELECTRIC MACHINERY MFG. CO. v. GENERAL ELECTRIC CO.

District Court, S. D. New York.

Feb. 13, 1936.

Pennie, Davis, Marvin & Edmonds, of New York City (William H. Davis, W. Brown Morton, and Morris D. Jackson, all of New York City, of counsel), for plaintiff.

Charles Neave, of New York City (Charles Neave, of New York City, Harrison F. Lyman, of Boston, Mass., and Charles E. Tullar, of Schenectady, N. Y., of counsel), for defendant.

COXE, District Judge.

These two suits are for infringement of the Hibbard reissue patent, No. 17,180, granted January 1, 1929, for a synchronous motor starting and control system. The original Hibbard patent, No. 1,640,322, was issued August 23, 1927, on an application filed January 17, 1920, and the reissue was for the purpose of adding a number of additional claims. All of the claims now in

issue appeared, however, in the original patent, with the exception of claims 20 and 21, and the only infringement alleged with respect to those two claims took place after the reissue patent was granted.

The first suit was commenced on April 28, 1931, and involved starting systems theretofore manufactured and sold by the defendant; after this suit was started, the defendant made changes or modifications in its systems; and on December 2, 1932, these changed or modified systems were also charged with infringement in the second suit.

The two suits were consolidated for trial, and tried together before the late Judge Coleman prior to his death; they were subsequently assigned to me, and heard on the original record made before Judge Coleman.

The plaintiff relies on claims 8 and 40 in the first suit; and on claims 1, 2, 3, 6, 7, 8, 9, 12, 13, 14, 15, 20, 21, 40, and 43 in the second suit.

The defenses are mainly noninfringement; but it is insisted that, if the claims are construed broadly enough to cover the defendant's systems, the patent is invalid over the prior art.

The invention of the patent is an automatic starting and control system for synchronous motors; and its function is to perform the necessary switching operations during starting, stopping, and normal operation of the motor.

A synchronous motor differs fundamentally from an induction motor, in that it requires direct current excitation. Neither will it start under load. It has, therefore, long been the practice to start a synchronous motor as an induction motor, and then, as it approached synchronism, to throw on direct current excitation by means of a manually operated switch to bring the motor up to synchronous speed. Similarly, when the motor pulled out of step, due to a temporary overload or a line voltage dip, it was necessary to remove the field excitation to prevent stalling; and this operation was also customarily performed manually.

These delicate switching operations not only required the careful and unremitting attention of highly skilled operators, but were at best extremely difficult to perform accurately and without injury to the electrical equipment. It was impossible, also, with manual control to regulate the motor from a remote point. These defects seriously interfered with the availability of synchronous motors for general use, and were a considerable handicap in promoting sales. There was a real and pressing need, therefore, for some form of automatic control which would be both effective and entirely dependable.

Hibbard perfected his invention in 1917, but was delayed until 1921 in putting it on the market by war work for the government. When his system appeared, however, it was immediately recognized by the industry as an important contribution, and since then it has played a significant part in the greater use of synchronous motors for all kinds of heavy loads requiring frequent starts and stops, and starts under heavy loads.

Undoubtedly there have been other contributing factors in this development of the synchronous motor; improvements in design have been made; manufacturing costs have been reduced; skillful advertising has increased the demand; and the critical attitude of the power companies with respect to the poor power factor of induction motors has provided an incentive; but, despite all of these, the fact remains that, without some practical and satisfactory method of automatic control, the general usefulness and availability of synchronous motors would have remained very much circumscribed. Moreover, the merit of Hibbard's invention has been recognized by four active manufacturers of control apparatus who have taken licenses under the patent.

The objects stated by Hibbard in his patent are as follows:

(a) "To provide a method and means for starting synchronous motors from the actuation of a push button."

(b) "To provide a method and means whereby the motor is started automatically at a reduced voltage and with no excitation current, and whereby when the motor has attained a predetermined percentage of synchronous speed, the full voltage will be applied to the motor, and thereafter the field will be automatically excited."

(c) "To provide improved means and method for automatically exciting the motor field as the motor approaches synchronism"; and

(d) "To provide a method and means whereby the field will possess the correct polarity when the field circuit is closed."

The patentee further states that one of the serious problems in handling synchronous motors "has been to devise means whereby the field excitation current may be thrown on at the proper time during the period required for the motor to attain synchronous speed."

He points out also that "no predetermined interval can be used for either applying the full voltage to the motor, or * * * for applying the excitation current at the right instant" because "the time required for the motor to attain synchronous speed will vary under load conditions," and further that, "if the field is of the wrong polarity when the field circuit is closed there will be a surge in the line current and the motor will also be subjected to heavy mechanical strains, so the proposition that the field (should be of the right polarity when the field) circuit is closed will be accepted by every one skilled in the art."

The patentee emphasizes that during the starting period an induced current will be generated in the field winding with a frequency equal to the slip; and he utilizes this induced field current "to determine, first, the point at which the full line voltage should be thrown on to the motor; second, to determine positively the point at which the excitation current should be applied; and third, I utilize it in positively supplying the excitation current to the field winding in the proper direction."

The drawings of the patent illustrate a series of relays depending for their actuation upon the induced current of the field winding; but the patentee states that his invention is directed, not to the particular form of the various relays, but "covers broadly any method or means controlling any part or all of the starting of a synchronous motor through a means controlled by the internal electrical condition of the field winding, and covers broadly any method or means by which the right polarity may be secured at the instant the field is closed."

This reliance upon the induced field current as the dominating thought of the invention is well brought out by the following quotation from the patent: "In other words, either the application of the full voltage or the application of the field excitation current, or both, may be made to depend absolutely and entirely upon the internal condition of the field winding itself, through the action of this induced current."

■ The best reference cited by the defendant as the nearest approach to Hibbard was the Maxwell patent, No. 1,089,659, issued to the defendant March 10, 1914. This patent was considered and rejected by the Patent Office in connection with the Hibbard application, thereby strengthening the regular presumption of validity of the Hibbard patent. Smokador Mfg. Co. v. Tubular Products Co. (C.C.A.) 31 F.(2d) 255, 257; Elkon Works v. Welworth Automotive Corporation (D.C.) 25 F.(2d) 968, 970.

Maxwell was concerned with induction motors for driving rolling mills which "have very low power factors at all loads and especially when under light loads"; and his object was "to change such a motor when running under light loads, automatically, to a synchronous motor." His problem was therefore much similar to Hibbard's, except that he was working with a motor which normally operated as an induction motor, and Hibbard was working with a synchronous motor which started as an induction motor but normally operated as a synchronous motor.

■ Maxwell shows a typical three-phase induction motor with regular primary and secondary windings; there is no third or field winding of an ordinary synchronous motor; and he changes to synchronous operation by opening one phase of the three secondary windings, and introduces in it direct current excitation. This change is made automatically by means of the relay P, which is connected in the secondary circuit, and is responsive to conditions in that circuit. The relay is a tuned relay which operates according to the frequency of the current in the secondary circuit; and there was testimony at the trial that such a relay tends to operate at a critical frequency, and, if this frequency is passed, the relay is no longer responsive, and will not work.

The essential difference between Hibbard and Maxwell is that Hibbard uses the induced current of the third or field winding to actuate his relays, whereas Maxwell's apparatus is controlled by the heavy power current of the secondary winding.

The defendant makes much of the fact that Maxwell stated in his patent as follows: "My invention is not limited to an induction motor but may be used with a synchronous motor which starts as an induction motor, nor is it limited to a motor of any particular number of phases."

The argument is that, if Maxwell had applied his invention to an ordinary synchronous motor with three windings, he would have used the induced current of the third winding, just as Hibbard did. This, however, is mere conjecture with nothing to indicate how the adaptation could be made; and, if conjecture is to be indulged in, I think it is a fair interpretation of the language that, with a conventional synchronous motor, Maxwell would not have opened the third winding to operate his relay, but the secondary winding, which was the only one shown in his patent. However, it is well settled that prophecy is not sufficient to invalidate a patent, Coffin v. Ogden, 18 Wall. 120, 21 L.Ed. 821; Badische Anilin & Soda Fabrik v. Kalle (C. C.) 94 F. 163, 168, affirmed (C.C.A.) 104 F. 802; Babcock & Wilcox Co. v. Springfield Boiler Co. (C.C.A.) 16 F.(2d) 964, 969; Asbestos, Shingle, Slate & Sheathing Co. v. H. W. Johns-Manville Co. (C.C.) 184 F. 620, 626; and that is all that Maxwell's statement amounts to in so far as the present litigation is concerned.

The defendant has also cited the Bradley patent, No. 404,466, issued June 4, 1889,. as limiting the scope of Hibbard's invention. This is another of the patents considered and discarded by the Patent Office; and it shows a number of theoretical control systems, none of which has ever been put to any practical use. Bradley maintains that the field circuit must be left open to prevent the flow of induced current therein, which is directly contrary to Hibbard's thought; and the Bradley patent, instead of teaching that the field winding might be used to operate the relays, states positively that it cannot be used for any such purpose.

I am satisfied, therefore, that Hibbard was the first to utilize the induced current of the third winding of a synchronous motor to perform, automatically, by means of relays responsive to the internal electrical condition of the third winding, the necessary switching operations to throw on, and remove, the full line voltage, and properly to apply in the right direction, and remove, the direct current excitation. I think also that the invention is sufficiently meritorious to entitle the claims to a fair range of equivalents.

The defendant has manufactured self-starting synchronous motors since 1895, and, prior to the commercialization of the Hibbard invention by the plaintiff, had advocated manual control only. No automatic control is disclosed or mentioned in the defendant's bulletins prior to 1923. Commencing in 1921, the plaintiff placed on the market a complete automatic control system; and in May, 1923, the defendant introduced a noninfringing time control system, but this was soon discarded as unsatisfactory.

In 1925, or four years after the Hibbard system was first offered to the public, the defendant made and sold the first of the two types of field responsive control systems charged with infringement in the first suit. In this system the defendant employed a slipping arm or "bumblebee" relay, which operated to apply field excitation when the induced slip frequency in the third winding fell to a predetermined value. The only feature to distinguish this relay from Hibbard's is that the slipping arm can be adjusted to delay the closing of the contact for a prescribed interval.

The defendant continued to manufacture and sell systems of the "bumblebee" type until after the issuance of the Hibbard patent in 1927; but in 1929 a change was made to the "tick tock" system, which is the second of the two systems alleged to infringe in the first suit. This "tick tock" system still relied on the slip frequency of the third winding for its operation, but it substituted in place of the slipping arm mechanism of the "bumblebee" type a mechanical pendulum to retard the contact closing apparatus in much the same way as the device of the earlier system.

The defendant was apparently in some doubt whether the "bumblebee" type had effectively avoided the Hibbard patent, for on January 29, 1930, the defendant wrote the plaintiff as follows: "Also, since the original and reissue Hibbard patents have issued, we have carefully considered these patents and we were of the opinion that we had modified our synchronous motor starting equipments so that they did not infringe the Hibbard reissue patent."

In 1932, after the first suit was commenced, the defendant changed to its present systems, which are the subject of the second suit, and together referred to as the "new systems." These new systems have (1) a slip frequency relay (SFR), which is responsive to the slip frequency current of the third winding, and, in combination with the rectifier, connected in series with it, acts to apply field excitation in the right direction; (2) a power factor

relay (PFR), which is physically connected to the primary or stator circuit, to remove field excitation after the motor has pulled out of synchronism for any reason; and (3) a squirrel cage protective relay (SCR) comprising a heater element connected in the motor field winding circuit to break the connection of the motor to the source when the heater element is heated to a predetermined degree.

It is conceded by the plaintiff that none of the defendant's systems has any automatic means for changing, during starting, from low to high voltage, but it is contended broadly that all of the other starting and switching operations are responsive to the electrical condition of the third winding, and therefore constitute infringement.

■ The defendant insists that various limitations were placed on the claims as a result of the Patent Office proceedings; and the file wrapper has been ransacked in an effort to discover some inconsistent statement or argument of the patentee which might be tortured into a suggestion of estoppel. This misuse of the file wrapper has been the subject of frequent comment by the courts of this circuit, and only recently the practice was condemned in no uncertain terms by Judge Learned Hand in Catalin Corporation v. Catalazuli Mfg. Co. (C.C.A.) 79 F.(2d) 593, 594, where it was said that the inquiry would be confined to determining "whether a patentee who seeks to disavow an element of his claim, was forced to introduce it in order to avoid rejection."

It is sufficient for the present purpose that after a fairly diligent search of the file wrapper I have been unable to find anything to support the contention that the plaintiff is now seeking to read out of the claims some limitation which the patentee was forced to accept in order to avoid rejection.

The claims in issue in the first suit are Nos. 8 and 40, and the plaintiff says that both are infringed by the "bumblebee" and "tick tock" systems. These claims are concerned with the means for applying direct current excitation, and claim 8, which is fairly typical, reads as follows: "8. In a system of the type described, the combination with a motor having an armature winding and a field winding, of means for applying voltage to the armature winding, a source of direct current, a resistance, a two-position switch arranged so that in one position it connects said resistance across the field winding and in the other position it connects the source of direct current to the field winding, and means responsive to the electrical condition of said field winding for operating said switch to disconnect said resistance from the field winding and to connect the source of direct current to the field winding when the motor has reached a predetermined speed."

The defendant insists that the "bumblebee" and "tick tock" systems do not infringe because the delaying mechanisms of these systems prevent the relays from operating "when the motor has reached a predetermined speed." There is no denial of the fact, however, that both mechanisms are set in motion by field responsive means, and, after a retarding interval, inevitably and infallibly perform the identical function of the Hibbard apparatus; the only difference is that, instead of the delay caused by mechanical inertia of the moving parts, as in Hibbard, the defendant has added time-delaying devices to make the contact closing operation a little slower. These additions are unimportant and nonessential, and are clearly insufficient to avoid infringement. Voices, Inc., v. Uneeda Doll Co. (C.C.A.) 32 F.(2d) 673; Williames v. Barnard (C.C.) 41 F. 358.

■ The defendant also contends that the "starting and running connections" specified in claim 40 refer to armature connections for changing from low to high voltage during starting, and that, as the defendant's systems concededly do not do this automatically, the claim is not infringed. The argument is that the word "motor" as used in the claim means "primary" or "armature," although these words are not employed. The language of the claim is, I think, plainly opposed to any such construction. Moreover, claims 23 and 26, which are not in issue, specify "starting and running primary connections for said motor," emphasizing the clear distinction between them and claim 40; and it is a settled rule of construction that the limitations of particular claims cannot be read in other claims for the purpose of avoiding infringement. Cadillac Motor Car Co. v. Austin (C.C.A.) 225 F. 983, 985; Automatic Recording Safe Co. v. Burns Co. (C.C.A.) 231 F. 985, 988. I think, therefore, that claims 8 and 40 have been infringed by both of the defendant's old systems.

The plaintiff charges in the second suit that claims 8 and 40 are also infringed by the defendant's new systems. These systems clearly respond to the language of both claims; they have the field discharge resistance, the two position switch, and the field responsive means of claim 8; and there are the starting and running connections, the switch for effecting the transfer from starting to running connections, and the relay (SFR) having its coil in the field winding for controlling the switch, all as specified in claim 40. Neither is infringement avoided by substituting in place of Hibbard's single mechanical switch two separate switches (FAC and FDC), connected together in the same circuit and operating simultaneously, and both controlled by conditions in the field winding and performing the same function as the Hibbard two position switch.

Claim 12 is alleged to be infringed by the defendant's new systems. This claim covers the additional feature of "a polarized frequency relay responsive to the frequency of the induced current in the main field winding, said relay being in operative connection with said field winding at all times."

The defendant does not deny that its slip frequency relay (SFR), in conjunction with the rectifier, functions in the same way as the Hibbard frequency relay 64 and the polarized relay 68 to apply field excitation; but it is insisted that they are not "in operative connection with said field winding at all times," as required by claim 12. There is, however, a direct physical connection between the relay SFR and the field winding of the defendant's systems during the starting period, and, although this connection is broken when the motor is synchronized, the operative connection continues, so that, when further operation is required, the physical connection may be again restored. That is all that the claim requires; and any other construction would be out of harmony with the language of claim 11, which provides that the relay is connected "in circuit with" the field winding rather than "in operative connection with" the field winding, as called for by claim 12. I think it is clear, therefore, that claim 12 is also infringed by the defendant's new systems.

Claims 1, 2, 3, 6, 7, 9, 13, 14, and 15 cover both the application and the removal of field excitation by field responsive means, and may properly be considered together as a group. Claim 7 is typical of the group, and reads as follows: "7. In a system of the type described, the combination with a motor having an armature winding and a field winding, of means for applying voltage to the armature winding, a source of direct current, a resistance, means arranged to short circuit the field winding of the motor thru said resistance when the motor is started, a switch for connecting said winding to the source of direct current, and means responsive to the electrical condition of said field winding for simultaneously opening the short circuit thru said resistance and closing said switch when the motor has reached a predetermined speed and for opening said switch when the motor speed falls below a certain value."

In the Hibbard patent the same frequency relay 64, which is used to apply field excitation, operates also to remove field excitation, when the motor for any reason pulls out of synchronism; and all of the claims in the group provide that the means used shall be responsive to the electrical condition of the field winding. The defendant's removal means consist of the power factor relay (PFR), and the plaintiff insists that this relay is responsive to the electrical condition of the field winding, and therefore responds to the claims.

■ The defendant first says that the power factor relay does not constitute infringement because the same means are not used to remove as to apply field excitation. But, clearly, the separation of a single device of double function into two devices, which, together, perform the same function as the single device, does not avoid infringement. Line Material Co. v. Brady Electric Mfg. Co. (C.C.A.) 7 F.(2d) 48, 50.

It is further contended by the defendant that the power factor relay does not operate at a predetermined speed, and is responsive to the electrical condition of the armature or stator circuit, and not of the field circuit, and therefore escapes infringement. The power factor relay comprises two coils, both connected to the alternating current supply lines for the armature in such a way that in one of them the current varies in proportion to the voltage in the armature circuit, and is in phase with it, while in the other the current varies in proportion to the amperage of the current flowing in the armature circuit, and is in phase with it; and, by means of these coils, it is possible to measure the power

factor of the armature circuit, so that, when it reaches such a low lagging value as to indicate an overload, and a pull out from synchronism, the direct current source may be automatically disconnected from the motor. It is stated in one of the defendant's bulletins (Exhibit 26) that the power factor relay operates to remove field excitation "only on a low lagging value of power factor corresponding to the motor operating out of synchronism"; and in another (Exhibit 29) that the relay "will not operate to remove field until the motor is definitely out of step, but when pull out has occurred, the power factor drops below 60 per cent. lagging so quickly that field is removed during the first slip-cycle out of synchronism." I think it is clear, therefore, that the defendant's relay operates after pull out from synchronism and not before; and admittedly it is more sensitive than the Hibbard relay, as it operates at the first indication of trouble with the motor, while the plaintiff's relay suffers a number of jars and jolts before it works at all.

I do not think, though, that the defendant's power factor relay is responsive to the electrical condition of the field winding in the sense that those words are used in the claims. Undoubtedly, a slip frequency current is induced in the motor field winding when the motor pulls out of synchronism, and this current in turn has some indirect effect on the power factor; but it is only a remote cause for the operation of the relay, and the principal and efficient cause is the power factor itself in the armature circuit, and not the slip frequency in the field circuit. This is fairly well indicated also by the language of the patent to the effect that the switching operations are dependent "absolutely and entirely upon the internal electrical condition of the field winding itself," which is certainly not the case with the defendant's power factor relay. I hold, therefore, that the direct current excitation removal claims have not been infringed.

It remains only to consider claims 20, 21, and 43 covering the combination of field responsive control of the armature or stator connections and field responsive excitation control; and claim 43 is understood to be typical of the group, reading as follows: "43. In a system of electrical distribution, a source of alternating current, a synchronous dynamo electric machine connected to said source, switching means for controlling the connection of said machine to said source, and means responsive to the slip frequency of said machine for controlling the excitation of said machine and the connection of said machine to said source."

The claims in this group have to do essentially with the Hibbard frequency relay 41', which controls the switch for changing from reduced to full voltage in the armature circuit; and the plaintiff says that this relay also functions to disconnect the motor from the line when the load is continued too long and the motor is not able to go back to synchronism. It is insisted that the defendant's squirrel cage protective relay is an infringement of these claims.

The squirrel cage protective relay of the defendant's systems comprises a heater element connected across a reactor, which is in series with the motor field; and, when the heater element is heated to a predetermined degree, the relay contacts are opened, and the motor is shut down. That the relay depends for its operation on the slip frequency is, I think, clear; indeed, that seems to be admitted in one of the defendant's bulletins (Exhibit 29), where it is stated that "the division of current between the relay heater and the reactor depends upon the slip frequency, which, in turn, is inversely proportional to motor speed."

The defendant urges, however, that the claims in this group do not cover breaking connections, but I do not think that the words "means for controlling the connection of said machine to said source" should be given any such limited construction. It is clearly the function of Hibbard's relay 41' not only to make but to break the connection of the machine to the source, and, inasmuch as the defendant's squirrel cage protective relay is "responsive to the slip frequency," I am satisfied that it responds to claim 43. The case is quite different, though, with respect to claims 20 and 21, which expressly provide for "electro-responsive switches for establishing reduced voltage armature connections for starting and full voltage armature connections for running"; and, inasmuch as the defendant's new systems have no means for changing automatically from low to high voltage at starting, I do not think that claims 20 and 21 are infringed.

There may be a decree in favor of the plaintiff holding claims 1, 2, 3, 6, 7, 8, 9, 12, 13, 14, 15, 20, 21, 40, and 43 of the Hibbard

reissue patent, No. 17,180, valid, and claims 8 and 40 infringed by the defendant's "bumblebee" and "tick tock" systems, and claims 8, 12, 40, and 43 infringed by the defendant's "new systems," and directing an accounting, with costs to the plaintiff.