FORSYTH v. GARLOCK et al.

(Circuit Court of Appeals, First Circuit. November 3, 1905. Rehearing Denied January 4, 1906.)

No. 589.

**1. PATENTS—INVENTION—ADAPTING MATERIAL TO NEW USE.**

A patent for a material for making steam packing may involve invention, although a similar material had previously been used for other and wholly different purposes.

[Ed. Note.—For cases in point see vol. 38, Cent. Dig. Patents, §§ 31, 32.]

**2. SAME.**

Where a patent for a material to be used for a stated purpose involved invention, it is not necessarily rendered invalid by the fact that the patentee also suggests its use for a different purpose, for which alone it would not be patentable.

**3. SAME—INFRINGEMENT—MATERIAL FOR STEAM PACKING.**

The Forsyth patent, No. 622,889, for a sheet. material for packing, matting, and the like, was not anticipated and discloses invention in so far as it relates to a packing material; also *held* infringed.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

Benjamin Phillips and George A. Rockwell, for appellant.

Wilson W. Thompson (Edward M. Bassett and Walter H. Gilpatric, on the brief), for appellees.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This is a bill in equity alleging infringement of the only claim in letters patent No. 622,889, issued on April 11, 1899, to James Bennett Forsyth, on an application filed on April 25, 1898, described therein to cover an invention of "a new and useful sheet material for packing, matting, and the like." The claim is as follows:

"A sheet material made up of a pliable sheet, one or more, of metal, and a sheet, one, or more, of vulcanized rubber, united to the pliable metal sheet substantially as described."

The Circuit Court dismissed the bill, and the complainant appealed to us. The learned judge in the Circuit Court found, in view of the state of the prior art, and especially of a patent issued to one Daft, to which we will again refer, that the patent in suit, if valid, could not be construed broadly enough to cover the product of the defendants. He also held that the patent is limited to sheet material, and that the infringing product is not sheet material, nor made by merely rolling up sheet material. Some mention is made of the file wrapper; but this is of no consequence, because at every point the application for the patent was overruled by the examiners, and also on appeal until the commissioner was reached, who reversed everything appealed against, and what is thus referred to occurred before the inventor reached him, and was wiped out.

The case is presented to us by the complainant as though the patented material was adapted solely, and intended solely, to and for steam packing; that is, for gaskets or for uses analogous to those to which gaskets are applied. In that view, although the patentee's material closely represents what had been before known in the arts, yet under the circumstances the new adaptation as a gasket, or for steam packing, sustains the prima facie evidence of invention which arises from the issue of the patent. The case thus comes within Watson v. Stevens, 51 Fed. 757, 2 C. C. A. 500, as applied by us in Davey Pegging Machine Co. v. Isaac Prouty & Co., 107 Fed. 505, 509 et seq., 46 C. C. A. 439. This is emphasized and illustrated by what appears in the patent issued to Albert B. Pratt, No. 665,931, on January 15, 1901, under which the respondents are producing at least one class of their alleged infringing devices. We quote from it at length, as follows:

"It has always been necessary to provide packing of some character between the faces of joints which are necessarily steam-tight. The most usual and ordinary forms of such packing are composed of rubber, metal, or a combination of both. These joint-closures or packings were first formed exclusively of rubber; but gaskets of this character when continuously subjected to heat disintegrate more or less rapidly and either spread to an extent which will open the joint or become brittle and crack. These results led to the introduction of metal packings; but these, except in complicated and expensive forms, are inefficient and are not available as closures for face-joints, because it is practically impossible to fit these metal packings with sufficient nicety to secure absolutely steam-tight joints, except where the contacting faces are disposed in angular relation. The facts related then led to the production of a combined rubber and metal packing-sheet which comprehended a plurality of thin rubber sheets and an intermediate woven-wire layer. This was a distinct advance, because the wire sheet gave body to the packing and prevented it from stretching, while permitting it to be sufficiently pliable to

adapt itself to the nature of the joint-faces. Many objections were urged against this form of packing, however, because the surface was exceedingly uneven and after comparatively little use the wires of the intermediate sheet would become exposed. These objections were overcome in great measure by the subsequent employment of a thin metal sheet, to the opposite faces of which the rubber was vulcanized; but the adhesion between the metal and rubber was imperfect, and this combination resulted in the blistering of the rubber and in its gradual separation from the metal core. Prior to my invention, the latest advance in the art, so far as I am aware, was directed to the elimination of this tendency of the rubber to pull away from the sheet metal, and with this end in view the pure rubber sheets were substituted by a compound of rubber and metallic oxids, which latter did actually serve to strengthen the union. Up to this point, however, the sheet-packing is open to many objections, because while the interposition of a metal sheet does overcome many valid objections to the use of the pure rubber, the tendency of the metal and rubber layers to separate practically precluded the employment of these composite packings and the introduction of the metallic oxids into the compound resulted in reviving an objection urged against the original solid rubber packings—to wit, the spreading and cracking of the rubber facings—that is to say, the incorporation of the metallic oxids is injurious to the rubber, and while it causes the latter to adhere more securely to the metal plate it causes the rubber to scale and crack under the continued heat to which these packings are ordinarily subjected.

"The object of my invention, therefore, is to produce a sheet-packing composed of a pliable metal sheet or plate having pure rubber facings or covering-layers which are caused to adhere closely to the plate without the use of metallic oxids and in a manner to preclude the possibility of either the cracking of the rubber or of its separation from the metal when subjected to the action of excessive heat for a considerable period."

Aside from the references contained herein to metallic oxids, which, so far as the patent in suit is concerned, are not of the substance of the invention, and are merely recommended for the purpose of securing the better adherence of the parts, what was thus said by Pratt clearly states the history of the art as proved in the record. In view of the rules applied in the cases we have cited, the facts as thus explained by him are sufficient to establish utility, novelty, and invention. Moreover, on a proper construction of what we have quoted from his specification, Pratt cannot be held to have assumed to claim an entirely new product, but only an improvement on what had preceded him in what he calls "the latest advance in the art." He also thus assumed that what he had invented was only a matter of perfecting in details what preceded him. Certainly we are of the opinion that such was the fact.

Notwithstanding our general statement that invention is shown, we might, perhaps, appear neglectful if we did not make reference to alleged anticipations, other than Pratt's, which are pressed on us. We can say generally as to them that they relate to arts essentially different from that of steam-packing, which art is special, requiring peculiar appliances and peculiar skill, involving difficulties which have been overcome only slowly and step by step, as shown by Pratt. The respondents cite over 40 patents alleged to either anticipate or narrow the art. Our general observation as to these is that the citation of so many patents by a respondent in an infringement suit sometimes tends, as we have several times said, not so much to weaken the complainant's position as to strengthen it, by showing that the trade had

long and persistently been seeking in vain for what the complainant finally accomplished. So far as we do not further refer to these patents, it will be because they are covered by what we have already stated as to their relation to other arts than that now before us, or because they are only a part of the history of the particular art involved here, as explained by Pratt in the manner we have already stated. For example, Daft apparently had mainly in mind a material suitable for sheathing ships, as to which it is well known that at the time of his invention in 1860 shipbuilders were looking for a substitute cheaper than copper, then the standard sheathing. However this may be, he described his invention as one for "improvements in coating iron." It was purely of a general nature in that broad art, and it had no special adaptation to the narrow art which we have before us. While, perhaps, Forsyth might successfully be charged with infringing Daft, if Daft's patent were in force in the United States, Daft did not anticipate Forsyth in the particulars to which Forsyth's invention relates, because Daft did not trouble himself about the peculiarities necessary to make a successful gasket. Our general observations also apply to patents like that to Dexter, of June 24, 1884, which was in the boot and shoe art, to that of Hancock, of June 27, 1871, which was in the same art, and to that of Sterne, of June 2, 1868, which was in the art of driving-belts, bands, and straps. Under some circumstances all these different alleged anticipations might answer as such if the obtaining of successful gaskets required no peculiar adaptation, or had been reached other than by the slow process described in our extracts from the specification contained in Pratt's patent. The patent to Potts, No. 304,128, issued August 26, 1884, for useful "improvements in step or stoop protectors," we will return to again.

We perceive no difficulty in deciding the question of infringement in favor of the complainant. The respondents' constructions are in two forms, each of which is claimed not to infringe. The words in the complainant's claim, "united to the pliable metal sheets substantially as described," refer, of course, to the specification. This permits one or more sheets of vulcanized rubber, "with a thin pliable sheet, one or more, of metal, the sheets of metal and rubber being held together in any suitable manner, but preferably by vulcanizing the rubber when in close contact with the pliable sheet metal." The application proceeds to give some details as to the manner of vulcanizing. It states that with the use of metallic oxids the rubber adheres more strongly to the metal sheet; but neither the vulcanizing of the rubber when in contact with the metal nor the use of the oxids are made essential. The invention did not relate at all to the method of uniting the metal with the rubber, but to the result after they were united, and therefore the specification says that they may be held together "in any suitable manner." Pratt seems to have had in contemplation dispensing with the use of metallic oxids; but his main purpose was to accomplish a method of uniting the rubber with the metal which would serve to strengthen the union. Therefore he punctured his metal sheet, describing it as "a flat, foraminous, pliable, metal-core plate," and directed that the rubber facings on the sides of the plate should

be united through the openings. Pratt thus demanded what Forsyth does not demand, not merely "one or more" sheets of rubber, but in any event two sheets; yet his method of uniting them was within the expression "in any suitable manner," contained in Forsyth's specification, and was a mere improvement in detail. To hold otherwise would be to reduce the law of equivalents to an absurd minimum. It is plain that this class of respondents' gaskets infringe.

The other class is described as a "tube material," made up, not from a sheet, but "from a strip," "not coterminous with the rubber sheet," but "a very narrow band." It is also said that in the respondents' tubes the rubber is not vulcanized on the metal, but may be detached and used elsewhere. It is plain that all such details involve no substantial distinction in the eyes of the law, unless forced to it by the use of the word sheet in the claim with which the complainant's patent closes. Even that narrow proposition is supported only on the erroneous theory of the respondents that the word sheet necessarily means the same as the word plate, and that therefore a sheet is necessarily a plate. This is not correct. Merchantable metal sheets are, of course, ordinarily in the form of plates, but the proper definition of the word indicates only extension, without reference to whether what is extended is flat or curved, smooth or with an uneven surface. There may be curved sheets, as well as flat sheets. For all the purposes of the art in question, the respondents' tubes, whether cast originally in the form of tubes or first made flat and then rolled, have, in any view of the law of equivalents, all the essential parts of the complainant's invention, arranged, so far as any required matters are concerned, in the same way.

This leaves us to deal only with the patent to Potts, already spoken of. If the complainant's specification made no reference to matting, and the claim commenced with the words, "In gaskets or steam-packing," or something of that nature, the view on which we have considered the case would easily be sustained, and Potts' patent could not become material. It is impossible to give the word "matting" any peculiar signification arising from its connection with the word "packing," because no such peculiar signification is found to exist, and it must be defined to include matting in common use in ordinary life. Therefore, if prior to Forsyth matting constructed according to the method point out in his specification had been found in the arts, Forsyth's claim would clearly be too broad; and unless it could be cured by disclaimer, or by reissue involving a redrafting of the patent, it would be invalid. Walker on Patents (4th Ed., 1904) 204; Edmunds on Patents (2d Ed., 1897) 184, 185. On the other hand, it must be borne in mind that mere prior accidental production, with an entirely different look from that of the patent in question, does not necessarily amount to anticipation in the sense of the law. Walker on Patents (4th Ed., 1904) 62, and authorities there cited. It cannot be questioned that on any construction of Forsyth's patent the sheet material which it claims, and the uses thereof, were intended for, and appertain to, the mass and body of the packing, matting, or whatever else it was supposed by the inventor to relate to. The specification

of the Potts patent is long, and difficult to follow. The gist of the whole may well be understood to be contained in the first claim as follows:

"A flexible, continuous, weighted protector or covering for doorsteps, substantially as shown and described."

There can be no doubt that in connection with this protector or covering, which meant mats in domestic use, Potts did describe and use a product made up of "thin sheet lead, or other flexible metal or material," inserted between strips, which might be strips of rubber, and which formed the hems. It would be a misuse of language to claim that the strips thus formed in part of "thin sheet lead, or other flexible metal or material," did not possess the pliability insisted on by the complainant, or to contend that they were not substantially the same as the product which Forsyth claims to have invented. On the other hand, this "thin sheet lead, or other flexible metal or material," was not used in the body of the mat; that is to say, it made no part of the continuous protector or covering, but it was in use only for purposes indicated by the word "weighted." Potts described his matting as composed of a layer or layers "of canvas, rubber, carpet, matting, or other suitable or desired flexible material"; but the strips we have spoken of were described as narrow, and as bordering the edges of the mat for the purpose of giving weight to the fabric. It was said that, in addition to these edge strips, other like strips might be secured in or at the middle of the matting, or otherwise interposed between them; but throughout it appears that none of them were properly a part of the mat, and that they were used only for weighting it, and holding it in position.

The Potts patent has been developed to us by the parties, pro and con, only very slightly; and, as stated by the complainant, there is not a single word of testimony with reference to it. On the other hand, all that is said by the respondents in reference to it is that Potts' invention covered a flexible weighted protector for steps, "with narrow strips of thin sheet lead, or other flexible metal, moulded into the edges, and also, if desired, other such strips between the edge strips." Therefore, even if the complainant's material, as described in his specification and claim, would have been anticipated if used before him for matting, Potts did not strictly anticipate because he did not use it for the matting itself, as a part of the body thereof.

The complainant's material may be of very little use as matting; and, very likely, were that the only purpose to which it could be applied, the invention could not be sustained. As, however, in view of its use as steam-packing, it involves invention, as we have explained, the mere fact that it might also be used for matting, or that the patentee suggested that it might be so used, would not deprive him of his right to a patent; and, on the other hand, the fact that the same material had been used in the manner in which Potts proposed to use it, under the circumstances we have explained, is, for the reasons we have stated equally ineffectual so far as concerns this particular suit, which relates to steam gaskets. We have no occasion to anticipate what the result might be, within the cases cited in the early part of this opinion, if the

question came between the complainant and somebody using the material in issue for some other purpose than that now before us.

The decree of the Circuit Court is reversed, the case is remanded to that court for further proceedings in accordance with law, and the appellant recovers his cost of appeal.