## ELKON WORKS, Inc., v. WELWORTH AUTOMOTIVE CORPORATION.

District Court, E. D. New York.    May 4, 1928.

No. 2830.

1. Patents ⬦112(1)—Presumption of validity of patent held strengthened by fact it was granted after consideration by office of prior patent picked as nearest approach to the invention.

That the patent in suit was granted after consideration by the Patent Office of the prior patent picked by defendant's expert as the nearest approach to the invention of plaintiff's patent strengthens the presumption of validity of patent in suit.

2. Patents ⬦66(3)—A foreign patent, not accepted till after date of application for patent in suit, held not prior art.

A patent is not prior art to the patent in suit, being a foreign patent, and not accepted till two days after the date of the application for patent in suit, and nine months after date of original application out of which patent in suit was divided, and the evidence not warranting finding that patentee of patent in suit made any of the statements in that application, or had knowledge of the statements therein prior to date of his invention of the patent in suit.

3. Patents ⬦328—1,089,907, for electrical make-and-break contacts of tungsten, held valid and infringed.

Coolidge patent, No. 1,089,907, for electrical make-and-break contacts of tungsten, *held* valid, to involve invention, not anticipated, and infringed.

In Equity. Suit by the Elkon Works, Inc., against the Welworth Automotive Corporation. Decree for plaintiff.

Mayer, Warfield & Watson, of New York City (F. P. Warfield, Lawrence Bristol, W. W. Fraser and Donald L. Brown, all of New York City, of counsel), for plaintiff.

Charles J. Holland, of New York City (W. D. L. Starbuck, of New York City, of counsel), for defendant.

CAMPBELL, District Judge. This is an action in equity for the alleged infringement of patent No. 1,089,907, dated March 10, 1914, issued to William D. Coolidge, assignor to General Electric Company, for electrical contact, on original application filed March 20, 1912, divided and this application filed December 17, 1912.

The defenses are invalidity and noninfringement. The question of title is not raised.

In the bill of complaint four other patents, viz: No. 1,181,742, to Coolidge, dated May 2, 1916; No. 1,155,426, to Liebmann & Megrath, dated October 5, 1915; No. 1,155,427, to Liebmann & Megrath, dated October 5, 1915; No. 1,229,960, to Humphries, dated June 12, 1917—were set up, but plaintiff has withdrawn them, and we are only concerned with patent No. 1,089,907, which will be described as the patent in suit.

The patent in suit relates to the construction of electrical make-and-break contacts, and the purposes of the patentee's invention are defined in the patent in suit as follows:

"My invention relates to electrical contacts, particularly for rheotomes or other vibratory circuit making-and-breaking devices, ordinarily used as sparking or igniting contacts for gas engines, as circuit controllers, for regulators, and for other like purposes."

The evidence on the trial as to tests was limited to one type of make-and-break contacts, the type used in automobile battery ignition.

This suit was based on all seven claims of the patent in suit, which read as follows:

"1. An electrical make-and-break contact of tungsten.

"2. An electrical make-and-break contact of malleable tungsten.

"3. An electrical make-and-break contact of tungsten, and a backing for the same of a metal of superior electric and thermal conductivity intimately joined thereto.

"4. An electrical make-and-break contact of tungsten integrally joined to a metal backing of superior electric and thermal conductivity.

"5. An electrical make-and-break contact of tungsten, a support for the same and a contact backing of a metal of superior electric and thermal conductivity intervening between the contact and support and integrally joined to both.

"6. An electrical vibratory make-and-break contact of tungsten.

"7. An electrical make-and-break impact of tungsten."

The defendant interposed the defense of noninfringement, but the evidence conclusive-

ly establishes the fact that defendant's devices, in structure and materials, are identical with those manufactured and sold by the plaintiff, and follow literally the teachings of the Coolidge patent, and that, if the patent in suit is valid, it is infringed by the defendant.

We thus come to the consideration of the only other defense, invalidity. The patentee described in the patent in suit the problems he had to face, as follows:

"In apparatus of this character, vibratory contact terminals of expensive metals, such as platinum and iridium, have heretofore been used, and it was found that these contacts deteriorated and became destroyed, so as to be unfit for further use, within a comparatively short time. The contacts were found to blacken and pit; their contacting surfaces became deformed by the continuous hammering action, and by the formation of irregular and variably distributed small protuberances, due, probably, to the transference of material from the cathode to the anode, whereby the normal distance between the contacts was reduced, and 'bridges' were often formed between the two contacts. It was also found that the accidental wetting of the contacts with oil seriously interfered with their operation. In addition to this, the materials heretofore used for vibratory contacts are softened by the heat of the sparks passing between them, to such an extent as to cause welding, or incipient welding."

He also stated in the following words his solution of the problem:

"My invention is designed to overcome these difficulties and it consists broadly in make-and-break contacts of metallic tungsten, preferably in the wrought or malleable form. It is a well-known fact that tungsten, when heated to redness in air, is soon covered with a layer of oxide which is practically an insulator, especially in the cold state, and this property of tungsten would seem to make this material unfit for use as contacts. But I have found by experiment that this is not so, and that, by reason of the light powdery or flocculent condition of the oxide, the same is shaken off almost as quickly as it is formed, so that vibratory contacts of tungsten, and especially of wrought or malleable tungsten, can be used with great advantage.

"I have found that the pitting of the contacts made of tungsten, while theoretically not absent, is practically insignificant; that the normal distance between the contacts remains sensibly constant during a long period; that no welding or incipient welding

of the contacts occurs; and that the presence of oil on the contact surfaces does not interfere with their operation. In consequence of these properties of tungsten which I have ascertained by long-continued experiments, contacts of this material have a very much longer life than contacts made of any other material known to me, or of any material that has heretofore been used.

"In a comparative test, I have found that a pair of tungsten contacts, after having made 32,000,000 of makes-and-breaks, were still clean and symmetrical, and apparently as good as new; while a pair of platinum contacts, operated under the same conditions and with the same number of makes-and-breaks, were found to have become so badly pitted, consumed, and deformed as to be unfit for further use. One of a pair of contacts is usually mounted on a resilient support, such as a spring, and the other to a rigid support, and the joinder between the contacts and supports should be very intimate, so that the contacts will not become loose by the hammering action to which they are subjected. I secure this result either by fusing to one face of the tungsten contact a backing of a rather bulky piece of a metal of superior conductivity for heat and electricity, such as copper, silver, or gold, and fasten the backing to a spring or rigid support by screws or other mechanical means, or I interpose the backing of superior conductivity between the contact and the support by fusion to both; that is to say, by using the backing as a solder. In either case, the heat generated in the contact is carried away rapidly."

Defendant takes issue with the statements of the patentee as to the effect of use on platinum-iridium contacts and contends that the patent in suit shows no new structural features but simply a substitution of material. Defendant offered to show the prior state of the art the following patents and publications:

United States patent No. 1,002,648, to Fred B. Corey, for relay contact. The invention of this patent consists in the discovery that molybdenum, when substituted for the platinum contact, gives with the carbon contact in relay devices equally good results at a greatly reduced cost. The conditions under which Corey's relay contacts operate are totally unlike the conditions under which the make-and-break contacts of the patent in suit operate.

Corey's relay contacts operated infrequently, at long intervals, and had to withstand lightning, and the presence of carbon

protected them from oxidation in the case of arc-ing. The contacts of the patent in suit make-and-break the electrical circuit periodically and with great rapidity, and are subjected to oxidation when arc-ing occurs. I am convinced that molybdenum carbon contacts cannot give the service of the tungsten contacts of the patent in suit, and that the device disclosed by Corey did not solve the problem which has been solved by the patent in suit.

[1] Defendant's expert picked this Corey patent as the nearest approach to the invention of the patent in suit, but the patent in suit was granted after consideration of the Corey patent by the Patent Office, and this strengthens the presumption of validity of the patent in suit.

German patent, No. 231,333, of 1911, to Allgemeine Elektricitats-Gesellschaft, for relay contact. This patent corresponds with the Corey United States patent last described, and for the reasons there stated, it did not solve the problem which has been solved by the patent in suit.

[2] British patent, No. 535, of 1912, issued to the British Thompson-Houston Company, Limited, for improvements in terminals, such as contacts and electrodes in electrical apparatus. This patent is not prior art, as it is a foreign patent, and was not accepted until December 19, 1912, two days later than the date of the application for the patent in suit, to wit, December 17, 1912, and about nine months later than March 20, 1912, the date of the original application out of which the patent in suit was divided, and the evidence does not warrant a finding that the patentee of the patent in suit made any of the statements in that application or had knowledge of the statements contained therein prior to the date of his invention of the patent in suit.

The motion of the plaintiff to strike out that patent and all testimony taken in relation thereto is granted, with an exception to the defendant.

German patent, No. 165,138, of 1905, to Siemens & Halske, for Roentgen tube, discloses the use of niobium (columbium) or tungsten as the anticathode in a Roentgen or X-ray tube. The use of niobium or tungsten in a vacuum as an anticathode, where it never makes contact with anything, is under conditions totally dissimilar to those which exist during the operation of the contacts in the patent in suit. That the substitution of tungsten for platinum as the anticathode of an X-ray tube was not obvious seems to be shown by that patent,

and therefore, for that purpose, at least, the two metals are not equivalents.

British patent, No. 72, of 1911, to the firm of Robert Bosch, for improvements in contact pins for interrupters for electric circuits. The invention disclosed in this patent consists in so constructing the contact surface of precious metal, that a considerable space is interposed between the point of interruption and the easily oxidizable metals, thereby causing a greatly increased gap for the passage of the arc.

No mention is made of tungsten in this patent, and Bosch did not teach the substitution of any new metal as the contact surface, but sought to materially decrease the possibility of an arc by redesigning the face of the contact and applying platinum and the like difficultly oxidizable metal as described therein. Obviously Bosch had no idea that tungsten would accomplish the desired result, although the filing date of the application was January 2, 1911, but a little over a year before the original filing date of the patent in suit.

French patent, No. 424,181, of 1911, to Bosch, is for substantially the same invention as the British patent to Bosch last discussed.

United States patent, No. 889,566, to Alfred A. Wohlauer, for electric switch. The purpose of the patentee's invention cannot be better described than in his own words, as follows:

"This invention relates to an improved electric switch or cut-out, by which the spark on breaking contact is confined in a vacuum tube, so that danger of fire and the wearing out of the metallic contacts is prevented, and an effective and quickly operated switch obtained."

The contact surfaces d and e are not tungsten, but probably copper, as stated by defendant's expert. Contained within the vacuum tube at either end are electrodes, connected with the contact surfaces e, and the only reference in the patent to tungsten is where the patentee says the electrodes inside the vacuum tube may be "of carbon, tungsten, or other suitable material." No reason is given for mentioning tungsten as a suitable material for the electrodes, and any conductor of electricity, provided it was not affected by the mercury in the vacuum tube, could be used with equal success.

In this patent the electrical circuit is completed within the vacuum tube by means of mercury, which, when the tube is horizontal, permits the passage of an electric current from one electrode to another, and

when the tube is vertical, or sufficiently out of the horizontal, flows to the lower end of the tube and away from the other electrode. The tube described in this patent is a vacuum tube, air tight, and the patentee in his patent made specific reference to the method of exhausting the tube.

The electrodes of this patent are not properly "contacts," as that word is used in the patent in suit, they never come together, but contact is only made between the electrode and mercury. "Contact" is defined in the Handbook of Electrical Engineers by Fowle, published by McGraw Hill Publishing Company, as "a contact is a surface common to two conducting parts united by pressure for the purpose of carrying current," and "rhetone" is defined in the Century Dictionary as "a device by means of which an electric current can be periodically interrupted; an interrupter."

There seems to me to be a wide difference in the conditions under which the contacts of the patent in suit operate, by coming directly into contact in the open air, where oxidation occurs, and the electrodes of the Wohlauer patent, which operate incased in a vacuum tube, where the only contact is made between the electrode and the mercury, without any hammering effect on the electrodes.

French patent, No. 418,280, of 1910, to Michotte, for use of tungsten metal and of uranium metal in the formation of electrodes of arc lamps. The use of tungsten and uranium contemplated by the patentee was in a nonoxidizable atmosphere, under conditions totally dissimilar to any existing in the normal use of the tungsten contacts of the patent in suit. The patentee described tungsten as an easily oxidizable metal, and he had no conception of the possibility of the use of tungsten for make-and-break electrical contacts, as described in the patent in suit, nor did he teach its use in this field.

German patent, No. 20,164, of 1882, to Alexander Storer, for process and devices for surrounding forge pieces while forging swages, with an atmosphere of nonoxidizing gases. This patent seems to be immaterial to any question presented in this case.

British patent, No. 24,918, of 1904, to Augustus Charles Hyde, for improvements in the manufacture of leading-in conductors for incandescent electric lamps, or other vessels requiring gas-tight joints. The patent makes no reference to tungsten nor to electrical make-and-break contacts, but relates to the use of hydrogen as a nonoxidizable atmosphere in the manufacture of a coated nickel alloy. This patent seems to be immaterial to any question presented in this case.

British patent, No. 5,232, of 1910, to Augustus Charles Hyde, for improvements in and relating to brazing, soldering, and like methods of uniting metallic surfaces, discloses an extension of the invention claimed in the last-described Hyde patent, of 1904. This is a process patent, and relates solely to a method of welding oxidizable metals in an atmosphere of hydrogen. Neither tungsten nor make-and-break contacts are mentioned in this patent, and it seems to be irrelevant.

United States patent, No. 419,032, of 1890, to Charles L. Coffin, for method of welding by electricity. The only relevancy of this patent I can see is that the patentee in the patent in suit describes the process of welding the tungsten disk of the contact to the steel back by the use of copper in a nonoxidizing atmosphere of hydrogen, but there are no process claims in the patent in suit, which is for a product, a combination of certain elements in certain ways.

None of the patents offered is relied on by defendant as an anticipation, and none of them do anticipate the patent in suit, nor can I find that the patentee in the patent in suit gained anything by their teaching.

The defendant also introduced the following six publications as showing the state of the art, but did not introduce any of them as an anticipation:

An editorial by the patentee of the patent in suit, published in January, 1912, in the Journal of Industrial and Engineering Chemistry, entitled "Some Applications of Wrought Tungsten and Molybdenum." Defendant apparently considers this editorial inconsistent with the original application for the patent in suit, before division filed March 20, 1912, but with this contention I cannot agree, because the editorial related to applications which were being tested out, and although he did in that editorial group tungsten and molybdenum, he in his patent eliminates molybdenum.

Corey had, at the time of the filing of the application for the patent herein, already patented the railway signal relay contact of molybdenum, in which service it is a satisfactory contacting material; but clearly it would not give satisfaction in the field to which the Coolidge patent relates, and in making his application for the patent in suit he eliminated molybdenum. The so-called inconsistencies between the editorial and the patent do not impress me as such,

because the statements in the patent have by a long experience been proven to be true, while the statements in the editorial more nearly express the opinions held before the filing of the application for the patent in suit, which, as appears by the patent in suit, the patentee found not to be in exact accord with the facts as developed by his continued investigation.

Article on "Ductile Tungsten," presented by W. D. Coolidge, at the meeting of the American Institute of Electrical Engineers, held at New York City, on May 17, 1910. This article, I assume, was offered to show that a study of the periodic table made it clear that tungsten could be substituted for platinum, molybdenum, carbon, and other contact surfaces, but I cannot agree with that contention; on the contrary, the fact that no one appreciated its use for make-and-break contacts for almost two years after the presentation of that article is to me evidence of the inventive merit of the patent in suit.

Article on "Ductile Tungsten and Molybdenum," read by Colin G. Fink, at the meeting of the American Electro-Chemical Society, held at Pittsburg, Pa., on May 5, 1910. The statements of this article as to similarity of behavior chemically, in many respects, of tungsten and molybdenum, and that their hardness depends very much upon the amount of mechanical working to which the metals have been subjected, and the presence of impurities, does not convince me that they are substitutable, as I am persuaded that for contact surfaces to be used generally molybdenum fails where tungsten is signally successful.

Article, "Contribution on Tungsten," by A. Stavenhagen, published in Berichte der Deutschen Chemischen Gesellschaft, in 1899. The bulk of this article deals with the production of metallic tungsten and tungsten aluminum alloys, and I cannot agree with defendant's expert that this publication informed the worker in the art that he did not need to fear the formation on the surface of a solid piece of tungsten of a layer of oxide which would interfere with its use for electrical contacts; on the contrary, it appears that the tungsten now used begins to oxidize at a temperature of 300° C., and at bright red heat forms the yellow oxide $WO_3$.

Gmelin-Kraut's "Handbuch der Anorganischen Chemie, 1912." The year of publication being that of the filing of the application for the patent in suit, this reference would not be available as a part of the prior art, without proof of an earlier date of publication; but since the trial the defendant has submitted the publication referred to in Gmelin-Kraut's Handbuch, an earlier publication by Zettnow, in Poggendroff's "Annalen der Physik und Chemie," dated 1867. This publication discloses two methods of obtaining metallic tungsten, and in connection with the second method two alternatives; in the first, the $WO_3$ is heated to incandescent whiteness and a crystalline shining powder is produced; in the second, the $WO_3$ is heated only to bright redness and a dark brown powder is produced; and Zettnow says of these two products: "While the metal produced at incandescent whiteness oxidizes only with difficulty when incandesced in the air, the latter burns with a rather strong spark to tungstic acid."

This publication was cited by defendant's expert as showing that the art knew, "that compact masses of tungsten, particularly those prepared at white heat temperature, did not have that extreme tendency to oxidize which Dr. Coolidge refers to on page 1 of his patent." It seems to me that, if the first portion of paragraph F of page 71 of the translation be read, his contention is not sustained; but in any event neither Gmelin-Kraut's Handbuch of 1912, nor Poggendorff's Annalen of 1867, taught the making of electrical contacts of tungsten.

A table entitled "The Elements, Arranged in Periodic System," found at page 22 of "A System of Inorganic Chemistry," by Ramsay. The defendant's expert sought to draw the conclusion, from a comparison of the positions of platinum, molybdenum, and tungsten in that table, that it was obvious prior to Coolidge that tungsten would work at least as well as the other two metals as a conducting surface for electrical make-and-break contacts, but I cannot find warrant for that conclusion. If the argument based upon comparative positions in the table be carried to its logical conclusion, it would lead to absurd results, as pointed out by plaintiff's expert.

In view of all the evidence, it seems to me that defendant has not sustained its contention that it was obvious at the date of the invention to substitute tungsten for the molybdenum and platinum contacts of the art. In fact, the situation here appears to be almost identical with that litigated in the following cases on the Just & Hanaman patent, for a tungsten filament for incandescent lamps, No. 1,018,502, General Electric Co. v. Laco-Philips Co. (C. C. A.) 233 F. 96; General Electric Co. v. Alexander (D. C.)

277 F. 290, affirmed (C. C. A.) 280 F. 852; General Electric Co. v. P. R. Mallory & Co. (D. C.) 286 F. 175 (preliminary injunction, 294 F. 562, final hearing), affirmed (C. C. A.) 298 F. 579; General Electric Co. v. Minneapolis Electric Lamp Co. (D. C.) 10 F.(2d) 851.

The contention of defendant that Coolidge's invention was a mere substitution of material is not, in my opinion, sustained, because not only did the use of tungsten make the construction much cheaper, but gave better results in operation than platinum, and made operation easier, especially where there was wetting with oil, as at times occurs; because, while accidental wetting with oil interferes with the operation of platinum contacts, it not only is not detrimental to the operation of tungsten contacts, but the Fansteel Company, on the basis of tests, actually recommends putting a drop of oil on the tungsten contacts when they are not operating properly, and surely the Coolidge invention was not a mere substitution for molybdenum.

However satisfactory it may be in some particular service, molybdenum to carbon or molybdenum to molybdenum contacts are failures in automobile ignition systems. The high price of platinum or platinum-iridium, the only satisfactory metals for electrical make-and-break contacts known before the patent in suit, furnished a sufficient reason for great efforts to discover something less expensive to take its place in make-and-break contacts for ignition systems; but no one was able to find it until Coolidge taught the world the use of tungsten, and the tremendous commercial success which has crowned that teaching is sufficient to remove doubt, if I had entertained any, on the question of invention.

[3] The patent is valid, and all the claims in suit have been infringed. A decree may be entered in favor of the plaintiff, with an injunction and the usual order of reference.