**WARNER BROS. CO. v. TREO CO., Inc.**

Civ. No. 674.

District Court, E. D. New York.

June 11, 1940.

Merrell E. Clark and Charles H. Walker, both of New York City, for plaintiff.

Mitchell & Bechert, of New York City (Fred J. Bechert and John W. Hoag, both of New York City, of counsel), for defendant.

MOSCOWITZ, District Judge.

This is an action for infringement of Field patent No. 1,995,801. The patent in suit was issued March 26, 1935 upon an application filed March 11, 1933 as a division of an earlier application, Serial No. 623,093, filed July 18, 1932. The patent relates to corsets or girdles of elastic fabric.

The plaintiff claims infringement of claims 1, 2, 3, 4, 5, 6, 7, 9 and 10, which read as follows:

"Claim 1. In a garment of the character described adapted to encircle the hips of the wearer, material capable of stretching up and down as well as across and lying at least in part between the hipbone lines at the sides and the center line at the back of the wearer, said material being formed of elastic yarn, and material secured to the first-named material and being capable of stretching up and down but non-stretchable across the wearer, the second mentioned material being located in a zone between the upper and lower edges of the garment, said garment being adapted to encircle the hips of the wearer, to extend above and below the plane of maximum girth taken through the posterior portions, and to stretch up and down at substantially all points overlying the posterior portions of the wearer."

"Claim 2. A garment of the character described including a plurality of panels of material formed of elastic yarn and adapted to stretch both up and down and

across, said panels lying at the sides of the wearer and joined to panels of elastic material adapted to stretch up and down but not across, said second-named panels being substantially at the center of the front and back of the garment and within the girth thereof, said garment being adapted to encircle the hips of the wearer, to extend below the posterior portions, and to stretch up and down at substantially all points overlying the posterior portions of the wearer."

"Claim 3. A garment of the character described including a plurality of panels of material formed of elastic yarn and adapted to stretch both up and down and across, said panels extending the full length of the garment, and a panel at the rear of the garment secured along both its vertical edges to said material and adapted to stretch up and down but not across, said garment being adapted to encircle the hips of the wearer, to extend below the posterior portions, and to stretch up and down at substantially all points overlying the posterior portions of the wearer."

"Claim 4. A garment of the character described, including material formed of elastic yarn and adapted to stretch both up and down and across and lying at least in part between the hip-bone lines at the sides and the center line at the back of the wearer, and material capable of stretching up and down but not across engaged adjacent an up and down edge to an edge of the first-named material, said garment being adapted to encircle the hips of the wearer, to extend below the posterior portions, and to stretch up and down at substantially all points overlying the posterior portions of the wearer."

"Claim 5. The garment as claimed in claim 4 wherein the second-named material lies at the front of the garment, substantially at the center."

"Claim 6. The garment as claimed in claim 4 wherein the second-named material lies at the middle of the back of the garment."

"Claim 7. A garment of the character described including material formed of elastic yarn and capable of stretching up and down and across, and material at the rear of the garment adapted to stretch up and down but not across, extending longitudinally between portions of the first mentioned material and adjoining the same

along a longitudinal dimension, the second mentioned material further extending the full length of the garment, said garment being adapted to encircle the hips of the wearer, to extend below the posterior portions, and to stretch up and down at substantially all points overlying the posterior portions of the wearer."

"Claim 9. The garment as claimed in claim 1, wherein the second-named material overlies at least a portion of the posterior portions."

"Claim 10. A garment of the character described, such as a corset, girdle or the like, adapted to be worn next to the body, to surround the hips of the wearer, and to confine the posterior portions, said garment comprising porous material formed at least in part of elastic yarn, extending below the posterior portions and being adapted to stretch up and down by virtue of its inherent elasticity, and other material adjoining said first-named material along an up and down dimension, formed of porous material made at least in part from elastic yarn and adapted to stretch both up and down and across the wearer by virtue of its inherent elasticity, said second-named material lying between the hipbone lines at the sides and the center line at the rear of the wearer, and said first-named material being substantially non-elastic in directions around the wearer, said garment being adapted to stretch up and down over substantially all portions overlying the posterior portions of the wearer."

Defendant pleaded in its answer by way of anticipation 37 prior patents, 5 prior uses, lack of invention, that the specification and claims are vague and indefinite and that the patentee does not point out and distinctly claim his alleged invention as required by Statute, and non-infringement.

At the conclusion of the trial the Court decided that the claimed prior use by the defendant had not been established and that defendant's garments, Exhibits 6, 7 and 8, infringed. Exhibits 6, 7 and 8 infringe claims 1, 2, 4, 5, 6, 9 and 10. Exhibits 7 and 8 infringe claims 3 and 7.

The objects of the invention, as stated in the patent, are as follows: "This invention relates to corsets, girdles and the like, and its principal object resides in the provision of an improved garment of this character including portions capable of stretching both up and down and across the wearer and other portions capable of

stretching up and down but not across, for purposes hereinafter indicated. Another feature resides in novel provisions for bones in such garments."

The plaintiff was organized in 1874 by the father and uncle of Lucien T. Warner, plaintiff's witness, who has been employed by plaintiff since 1901. He is, undoubtedly, fully familiar with the business of manufacturing corsets, corselets and girdles. He testified that the rear portion of a woman's body is from two to four inches longer vertically when she is seated or bending over than when she is standing erect, and that the purpose of making the back and front panels elastic vertically is to prevent the garment from riding up. His testimony is accepted as correct. He testified:

"Q. 9 This garment, plaintiff's Exhibit 2 for identification, was manufactured by your company under this patent? A. It was.

"Mr. Walker: Then I offer it in evidence.

"Q. 10 Will you please explain to the Court where in that garment the constricting effect is furnished? A. The constricting function is furnished in the side panels, the horizontal elasticity of the side panels.

"Q. 11 The back panels are inelastic horizontally, back and front panels are inelastic horizontally, Mr. Warner? A. They are.

"Q. 12 Are they elastic vertically? A. They are elastic vertically.

"Q. 13 Will you explain to the Court the reason for that, speaking first of the back panel? A. The reason for the elasticity vertically of the back panel is because if that were not elastic vertically the garment will ride up on the figure. The problem of corseting a woman about the hips involves keeping it in place so that it won't slide out of place, in which case it does not perform the function for which it is intended. In a sense, a woman does not stand erect or stand still all the time, but sits down, kneels down, leans down to pick up things from the floor, and so forth, in her ordinary life. When she wears a garment that has no vertical elasticity extending from about the hip-bone on one side to about the hip-bone on the other side and around her back, the garment that she wears will slide up unless it is held so firmly down by hose supporters

anchored to the stockings that it simply can't slip, in which case it will come down. In other words, we know by measurements that when a woman leans over the hinge of the body, or at the point where the legs are joined to the body, causes an elongation from the waist-line down over the buttocks to a point below the buttocks. That elongation, according to the size of the woman and her general conformation, will be from two to four inches, so that that line actually measures from about two up to about four inches more when she sits down in a chair than when she is standing erect.

"Now, every time she sits down, if this garment will not extend vertically and follow the skin down, when she stands again a portion of her body will have come out of the corset, and will no longer be covered by it, and either the whole corset will ride up or it will ride down, or what is more likely, it will draw itself together and wrinkle up because the dimensions of a woman around her waist are smaller than the dimensions around the hips, and the tendency is for a garment to creep up into this narrower horizontal circumference.

"Q. 14 Where would this riding down occur, at the top rather than at the bottom, if it occurred? A. If it occurred the riding down would occur at the top.

"Q. 15 And riding up would occur at the bottom? A. Riding up would occur at the bottom. Therefore, since we have learned that for the garment to actually stay in place without subjecting it to an enormous strain to hold it down, it is necessary to have vertical elasticity which will extend around the entire posterior portion of the body.

"Q. 16 Is it feasible to fasten the back and sides of the garment down firmly enough with hose supporters to prevent it from riding up? A. No, because it will tear the hose, the silk hose that the women wear will not stand any such strain.

"Q. 17 Why is that back panel made inelastic horizontally? A. Well, that is because the women do not desire to have their buttocks round out in the rear, and if it is elastic horizontally across there, it will round out.

"Q. 18 The front panel is inelastic horizontally to confine the abdomen in the same way? A. The front panel is inelastic horizontally in order to confine the

abdomen, because there is also a tendency to round out.

"Q. 19 Does the part of the body that is covered by a part of the side panel of this garment elongate vertically when the wearer bends over or sits? A. Yes, that part of the body just in the rear of the center of the side of the hip, about a point where the hip-bones are, that portion of it, when the wearer sits or stoops, also elongates vertically."

The garment provided in the patent in suit is known as the "two-way, one-way". The patent No. 1,919,292 granted to John Field in July 1933 related to a garment made of "two-way stretch" elastic fabric. This patent did not solve the problem of the patent in suit. That patent permitted the protruding portions of a woman's anatomy to round out in an undesirable way. The prevention of "riding up" was solved in the patent in suit without permitting such undesirable "rounding out". The circumferential constricting effect is accomplished by horizontal elasticity in the side panels of the girdles. The prevention of "rounding out", that is, controlling the abdomen and buttocks is exercised by front and back panels which are inextensible horizontally. All the panels are elastic vertically, this prevents "riding up".

Garments in the prior art had a tendency to "ride up" and did not have a sufficient confining effect upon the protruding portions of the body of the wearer of the garment.

There was a great demand for a girdle that would not ride up and round out the figure and a feverish effort was made by the manufacturers to accomplish these objects.

It has been established beyond a reasonable doubt, and this must be the test applied by the Court, that the invention of the patent in suit was conceived May 1, 1932 and was reduced to practice on May 3, 1932. Field, while at home on Sunday May 1, 1932, conceived the invention. On May 3, 1932 he made a girdle which was a "two-way, one-way". Certainly, by May 3d when the garment was actually made, Field accomplished that for which all the corset manufacturers had been striving.

The problem which this patent solved was providing a garment portions of which were capable of stretching both up and down and across the wearer and other portions capable of stretching both up and down, but not across.

Defendant relies principally upon the Morin French patent No. 640,666 issued April 3, 1928 and the "Wisp" Publication (Exhibit Y), which appeared in the Corset and Underwear Review published on May 5, 1932, claiming that these negative any invention on the part of Field.

Disposition can readily be made of the "Wisp" Publication (Exhibit Y). Field conceived his invention on May 1, 1932; furthermore, this publication does not disclose a girdle of the character defined by plaintiff's patent. Exhibit Y describing the "Wisp" garment states:

"And now * * * Wisp 'Sensation' for June the first silk two-way stretch garment.

"When we say 'Wisp' we mean just that! It's a mere nothing in weight—and cool as a cucumber. The cream of the hot-weather garments!

"Made of sheer silk, two-way material, in a new porous weave, with set-in front and back panels of Tricot silk mesh to match exactly. Bust sections also of smart, cool mesh.

"Firm stretch-around in this garment, with plenty of stretch-up-and-down * * *. An arrangement that 'slims' even difficult figures into thrillingly perfect lines!

"Low cut back, for additional coolness and adaptability.

"Antoinette Donnelly, famous style specialist, selected 'Wisp' as the June corset-of-the-month. She says— 'Wisp solves the hot-weather corset problem. * * * It's so cool and comfortable, yet marvelously restraining!'"

"Sensation Wisp June Garment of the Month. The June garment of the month, featured by Kops Brothers has been named, 'Sensation Wisp,' because it is only a wisp.

"This is the newest and, we might also say, most attractive of the Sensation family, which cleverly combines Lastex with Silk Trico. The Lastex itself is entirely covered with pure silk and is knitted on a trico mesh machine. The front and back panels, as well as the enticing disc like shaped bust, are made of the plain silk trico while the rest of the garment is made of Lastex silk trico. The trico itself has only the up and down stretch so that it holds the figure more firmly. Having the vertical stretch permits this non-

elastic portion to pull down with the rest of the garment so it stays in place on the figure.

"The back is cut as low as 'Eve'. It is a most charming and beautiful summer garment and its color is extremely good. In looking over the entire 'Sensation Family' we feel that 'Wisp' is 'the cleverest number of them all'."

This advertisement states that the garment is made of a sheer silk two-way material in a new porous weave with set-in front and back panels of Tricot silk mesh to match exactly, and that it is the first silk two-way stretch garment. Trico is a knitted material. Exhibit 19 is the kind used in 1932. It was, undoubtedly, not a one-way stretch material.

Mr. Warner testified:

"Q. 257 You mean that there is no such thing as one-way stretch tricot in the sense that it will stretch in one direction but is inextensible in the other direction? A. There is no such thing.

"Q. 258 Is tricot a one-way stretch material in the sense that it will stretch in any one direction provided you allow it to contract in the other direction? A. That is exactly the way it works.

Q. 259 And it is stretchable in either direction provided it is permitted to contract in the other direction, isn't that so? A. That is true.

"Q. 260 That is true not only of tricot in Plaintiff's Exhibit 19, but of any tricot that you ever heard of made of inelastic fibres? A. That is true, and I have experimented with a great many tricots.

"Q. 261 Is tricot a thing that you use in your own company? A. Yes.

"Q. 262 Will you explain to the Court what the action of this tricot material would be in the front and back panels of a corselette such as is shown on the first page of Defendant's Exhibit Y, in which, as I understand it, the side panels are of two-way stretch elastic fabric? A. If that material is put in the front or the back panel of a corselette like that illustrated in this Exhibit Y, and if you stretch it horizontally about the body, it will narrow lengthwise of the body, and if you pull it down lengthwise of the body it will exercise a constricting power around the body.

"Q. 263 Suppose this corselette is made sufficiently small to exert a constricting effect upon the body of the wearer to an extent comparable to that exerted by the girdles we have been considering in this case, will it be possible for the front and back panels to elongate vertically on the wearer? A. That is a long question. will you repeat it, please? (Last question repeated by the reporter.)

"A. They would not elongate vertically on the wearer unless a very strong pressure or tension down and upward were put on it, so that if it was possible to compress the wearer horizontally any more, you can extend it vertically, but you would have to compress the wearer to a greater extent in order to do so.

"Q. 264 Suppose we confine our consideration to a situation in which the vertical force exerted on the front and back panels is of a magnitude that can exist in the normal use of a corset. Then what would happen to the vertical length of the front and back panels? A. They would be shorter than they would be before being fit tightly, as these girdles were in the court room.

"Q. 265 Would that shortening be a matter of a fraction of an inch, or would it be more substantial? A. I think it would be substantial; in fact, I have tested it and found it to a substantial degree at times.

"Q. 266 And in such a garment as you have described, in which the front and back panels are shortened in their vertical dimension upon being put on by the wearer, what happens to the garment when the wearer bends or sits down or kneels down? A. It will ride up; in fact, it will ride up even more than if it were absolutely inextensible cloth. Every pressure sideways around the body makes this shorter lengthwise up and down the body. When a woman sits down she not only elongates, she also spreads, and the result is, with this material here at the back, it would have a tendency to pull up.

"Q. 267 Is the area of a piece of tricot, once it has been stretched enough to have the slack taken out of it, substantially constant? A. Yes.

"Q. 268 Is it possible to redistribute that area by stretching the material in one direction or the other? A. Yes, by pulling it one way or the other.

"Q. 269 But you cannot substantially increase the area? A. The area, after you have taken the slack out of the yarns

the area would remain substantially constant.

"Q. 270 Are the forces applied horizontally in a girdle of greater or less magnitude than the forces applied vertically? A. Ordinarily they are of a very much greater magnitude.

"Q. 271 Are the forces applied vertically in the normal use of a girdle or corselette of the type of the Field patent sufficient to stretch Finesse material to the position shown in the lower right-hand photograph on Defendant's Exhibit 5? A. No, not when the Finesse material is put in the side panels of the garment.

"Q. 272 Do you consider that the front and back panels of the type garments accused here, Plaintiff's Exhibits 6, 7 and 8, are or are not porous? A. The front and back panels?

"Q. 273 Yes. A. They are porous. If you wanted to make a bag of them, they would not hold water."

The "Wisp" Publication (Exhibit Y) does not properly describe the use of the material Tricot. It has no up and down stretch. The "Wisp" garment would ride up and down.

■ The Morin patent was one of the prior patents cited by the Patent Office during the prosecution of the Field patent and is the defendant's best reference. The rejection of the Morin patent by the Patent Office gives added strength to the presumption of validity. In Electric Machinery Mfg. Co. v. General Electric Co., D.C.S.D.N.Y., 13 F.Supp. 940, 942, affirmed, 2 Cir., 88 F.2d 11 the Court stated:

"The best reference cited by the defendant as the nearest approach to Hibbard was the Maxwell patent, No. 1,089,659, issued to the defendant March 10, 1914. This patent was considered and rejected by the Patent Office in connection with the Hibbard application, thereby strengthening the regular presumption of validity of the Hibbard patent. Smokador Mfg. Co. v. Tubular Products Co. [2 Cir.] 31 F. 2d 255, 257; Elkon Works v. Welworth Automotive Corporation (D.C.) 25 F.(2d) 968, 970."

The following language appears in the Morin patent:

"It has already been suggested to make girdles or corsets of elastic fabric in which the elastic of some of their constituent parts acts in a direction perpendicular to that of the elastic entering into the composition of other parts. Thus garments were made in which the abdominal and dorsal sections can be stretched in width, while the sides which connect them can only be stretched vertically. It results from these arrangements that the lateral flexions of the upper part of the body tend to displace the girdle or corset. In order to wear them, it is, therefore, necessary that the lateral sides be held by their lower edge. This makes it necessary to arrange either ordinary garters or quite a large number of side garters to hold the girdle or corset in its proper position.

"The present invention purposes an improvement in girdles or corsets of this type, this improvement consisting essentially in making the abdominal and dorsal surfaces in such a manner that they can stretch vertically only, while on the other hand the sides which connect them can be stretched transversely only. It results from these arrangements that the lateral sides of the corset or girdle can fit the body closely and particularly the protuberances of the hips, which prevent vertical sliding. Furthermore, these lateral parts react (act) elastically upon the abdominal and dorsal surfaces in the direction in which they cannot be stretched. There are thus caused local compression stresses, inasmuch as the vertical stretchability of these parts of the girdle or corset makes it, nevertheless, possible for them to fit the lines of the person."

Morin provided a garment in which the side panels were made of one-way stretch material stretching horizontally only. The front and back panels of Morin are the same as Field, both stretch vertically. Field's patent shows a combination of the "two-way, one-way" stretch material. This was lacking in Morin.

A girdle should not "ride up" and should not "round out" the figure of the wearer. It is simple to claim, now that it has been accomplished, that anyone skilled in the art and with knowledge of the Morin patent and the "Wisp" garment (Exhibit Y) could have solved the problem and that Field's invention was obvious—everything is obvious after the event.

■ While it is certainly not conclusive, it is persuasive that defendant in its attempt to defeat the patent has found it necessary to set up 37 prior patents. Why so many patents?

" * * * the citation of many prior art references, none showing a solution of the problem presented, is persuasive evidence of invention. Scott v. Fisher [Knitting Mach. Co., 2 Cir.] 145 F. 915, 916; Forsyth v. Garlock [1 Cir.] 142 F. 461, 463." Handy et al. v. American Flyer Mfg. Co., D.C.S.D.N.Y., 44 F.2d 633, 635, affirmed, 2 Cir., 48 F.2d 1074;

" * * * the citation of so many patents by a respondent in an infringement suit sometimes tends, as we have several times said, not so much to weaken the complainant's position as to strengthen it, by showing that the trade had long and persistently been seeking in vain for what the complainant finally accomplished." Forsyth v. Garlock et al., 1 Cir., 142 F. 461, 463, 464.

These prior patents show that manufacturers of girdles had been seeking the solution of the problem which was solved by Field. None of the prior patents or publications anticipate the patent in suit. As a matter of fact they aid, showing the Field invention was entirely new.

While it does not prove invention, nevertheless it may be pointed out that 34 manufacturers have taken licenses and are paying royalties for the use of Field's invention.

The defendant has paid tribute to the plaintiff by imitation of plaintiff's girdles described in plaintiff's patent.

Time was when a woman, to be considered beautiful, had a buxom appearance with an ample waistline. Later there came into vogue the hourglass or wasplike waist. In the last few years women have dieted and the hourglass appearance of women has passed on—the streamline figure has appeared.

Should a Judge, a mere man, balance his judgment against that of many thousands of women who, by wearing the plaintiff's girdles, have indicated their belief in the merits of the Field invention? While commercial success does not in itself indicate invention, nevertheless in this case it is a testimonial of merit that these women, who are certainly discriminating in the selection of girdles, have chosen plaintiff's girdle. It is unlikely that, with the many girdles on the market, these women would select such an intimate object unless it was worthwhile, novel and meritorious.

Findings of fact and conclusions of law have been submitted by the plaintiff. These I adopt with certain modifications, as follows:

### Findings of Fact.

1. United States Patent No. 1,995,801, relating to corsets or girdles of elastic fabric, was issued to the plaintiff March 26, 1935 upon an application of John Field filed March 11, 1933 as a division of an earlier application of the same inventor filed July 18, 1932.

2. Plaintiff is still the owner of this patent and of all rights of recovery under it.

3. The garment of this patent was conceived by Field, president of the plaintiff company, May 1, 1932, and a garment embodying his conception was made May 3, 1932.

4. The garment of this patent has been a marked success, plaintiff having sold over $8,000,000 worth since they were introduced in 1932. Plaintiff's sales of the patented garment in 1939 amounted to more than $2,000,000, which was almost two-thirds of its total business.

5. Thirty-four of plaintiff's competitors have taken licenses and are paying royalties under the patent.

6. Of the thirty-seven patents pleaded as anticipations of the Field patent in suit, the only ones introduced in evidence by the defendant were cited and rejected by the Patent Office prior to the issuance of the Field patent. Five additional patents of those pleaded by defendant were introduced in evidence by plaintiff. None of these prior patents discloses a garment of the character of the Field garment, or anticipates the Field patent.

7. Of the five alleged prior uses pleaded, only one, by the defendant itself, was attempted to be proved. The evidence offered in this connection is not convincing and does not meet the strict standard required in such matters.

8. Of the two printed publications introduced by the defendant (Exhibits X and Y), one, the May issue of the Corset and Underwear Review, Exhibit Y (published May 5 and 6, 1932), was published after the date of Field's invention (May 1, 1932). Neither publication discloses a garment of the character defined by the Field patent.

9. The patent in suit involves invention over the prior art and is valid.

10. Within the six year period immediately preceding the filing of the bill of complaint herein defendant made and sold garments exemplified by Exhibits 6, 7 and 8. These closely resemble the Field garment and admittedly function on the same principle. All three of these garments infringe claims 1, 2, 4, 5, 6, 9 and 10 of the Field patent. Exhibits 7 and 8 also infringe claims 3 and 7.

11. In conformity with the provisions of law, prior to the filing of this suit defendant was given written notice of the patent in suit and of its infringement.

### Conclusions of Law.

 1. Claims 1, 2, 4, 5, 6, 9 and 10 of the Field patent 1,995,801 are valid and have been infringed by defendant in the manufacture and sale of garments exemplified by Exhibits 6, 7 and 8.

2. Claims 3 and 7 of Field patent 1,-995,801 are valid and have been infringed by defendant in the manufacture and sale of garments exemplified by Exhibits 7 and 8.

3. Plaintiff is entitled to an injunction and accounting with the usual order of reference.

Settle decree on notice.